

**U.S. Department of Justice**

*Leah B. Foley*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*                    *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

January 29, 2026

John A. Markey, Jr., Esq.
Markey & Walsh, LLC
50 Homers Wharf
New Bedford, MA 02740

      Re:    United States v. John Oliveira & Sons Stamp Concrete, Inc.
                Case 1:26-cr-10004-PGL

Dear Mr. Markey:

The United States Attorney for the District of Massachusetts (the "U.S. Attorney") and your client, John Oliveira & Sons Stamp Concrete, Inc. ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

    1.    Change of Plea

No later than February 4, 2026, Defendant will plead guilty to Count One of a criminal Information charging a violation of 29 U.S.C. § 666(e), Willful Violation Causing Death to Employee. Defendant admits that Defendant committed the crime specified in this count and is in fact guilty of it.

The Defendant agrees to the accuracy of the attached statement of facts.

    2.    Penalties

Defendant faces the following maximum penalties: incarceration for six months; probation for five years; a fine of $500,000; a mandatory special assessment of $50; and restitution.

    3.    Sentencing Guidelines

The parties agree that the U.S. Sentencing Guidelines ("USSG") do not apply because the crime charged is a Class B misdemeanor. *See* USSG § 1B1.9.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.  Sentence Recommendation

The parties agree to recommend the following sentence to the Court:

   a) A term of probation of eighteen (18) months, to include as a special condition compliance with the attached Safety Compliance Plan;

   b) No fine;

   c) a mandatory special assessment of $50, which Defendant must pay to the Clerk of the Court by the date of sentencing; and

   d) restitution of $115,000.

Defendant agrees that all criminal monetary penalties, including special assessment, restitution, and/or fine imposed shall be due and payable before December 31, 2025, and further agrees that any Court-ordered repayment schedule does not preclude further enforcement or collection by the United States.

Defendant agrees that, in addition to the restitution referenced above, it has fulfilled its obligations to contribute to the settlement reached in Josue Deo Tiquiram Sam v. John Oliveira & Sons Stamp Concrete, Inc. (Massachusetts DIA Case # 2168223). Pursuant to the settlement reached in this case, $120,000 shall be paid in worker's compensation benefits to the family of the victim within ten (10) days of the formal approval of the DIA Slump Sum Settlement by the Administrative Law Judge handling the matter for the Massachusetts DIA. Defendant agrees that the agreed amount of restitution specified in subparagraph (d), *supra*, is to be provided in addition to the amount paid to the victim's family pursuant to the worker's compensation settlement – *i.e.*, that the gross amount of $235,000 is to be paid to the victim's family to resolve the two matters.

5.  Waiver of Appellate Rights and Challenges to Conviction or Sentence

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

   a) Defendant will not challenge Defendant's <u>conviction</u> on direct appeal or in any

       other proceeding, including in a separate civil lawsuit; and

    b) Defendant will not challenge Defendant's <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

The U.S. Attorney agrees that, regardless of how the Court calculates Defendant's sentence, the U.S. Attorney will not appeal any sentence that includes restitution of $115,000.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence) will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence, regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.</u>

Defendant is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

6.    <u>Civil Liability</u>

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

7.    <u>Breach of Plea Agreement</u>

Defendant understands that if Defendant breaches any provision of this Agreement, or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Attorney the right to be released from the U.S. Attorney's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring

before the date of this Agreement.

    8.    <u>Who is Bound by Plea Agreement</u>

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

    9.    <u>Modifications to Plea Agreement</u>

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

\* \* \*

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney William F. Abely.

Sincerely,

LEAH B. FOLEY
United States Attorney

By: _____
ANNE PARUTI
Chief, Major Crimes Unit
MARK GRADY
Deputy Chief, Major Crimes Unit

_____
WILLIAM F. ABELY
Assistant U.S. Attorney

ACKNOWLEDGMENT OF PLEA AGREEMENT

    I, Michael Oliveira, Director and Secretary of John Oliveira & Sons Stamp Concrete, Inc. ("Oliveira & Sons"), have been duly authorized by the Shareholders and Directors of Oliveira & Sons to execute this Plea Agreement, and I expressly acknowledge the following: (1) I have read this Agreement and discussed it with counsel to Oliveira & Sons; (2) this Agreement accurately presents the agreement between Oliveira & Sons and the United States Attorney's Office for the District of Massachusetts; (3) there are no unwritten agreements between Oliveira & Sons and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to Oliveira & Sons in connection with this guilty plea; (4) Oliveira & Sons has not received any prior offers to resolve these criminal allegations; (5) Oliveira & Sons has had an opportunity to discuss this Agreement fully and freely with its counsel and (6) Oliveira & Sons is fully satisfied with the advice and representation provided to it by its counsel.

_____
Michael Oliveira
Authorized Representative for Oliveira & Sons

Date: _January 29, 2026_

    I, John A. Markey, Jr., the attorney representing John Oliveira & Sons Stamp Concrete, Inc., hereby acknowledge the following: (1) I have reviewed and discussed this Agreement with my client; (2) I have explained fully each one of the terms of the Agreement to my client; (3) I have answered fully each question put to me by my client regarding the Agreement; and (4) I believe that my client fully and completely understands the terms of the Agreement and it entering into the Agreement freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
John A. Markey, Jr.
Attorney for Defendant

Date: _January 29, 2026_

Statement of Facts

1. John Oliveira & Sons Stamp Concrete, Inc. (the "Defendant") is a family-owned stamp concrete business that maintains a premises in East Freetown, Massachusetts.

2. The Defendant is and at all relevant times has been an "employer" engaged in commerce as defined the Occupational Safety and Health Act.

3. Josue Deo Tiquiram Sam, age 24, (the "Victim") was an employee of the Defendant.

4. During the course of its business activities, the Defendant handles and moves goods and materials such as stone, gravel, soil, loam, and concrete. In and around 2023, the Defendant utilized an Extec Series 5000 soil screener (the "Equipment") for purposes of processing soil. The Equipment's overall length was 46' 7", width was 9', and height was 13' 2". The total gross weight of the Equipment was approximately 35,880 lbs.

5. The tail conveyor of the Equipment – which weighed approximately 1,500 pounds – could be placed in a closed (vertical) position or could be placed in an open (horizontal) to an approximate 45° angle.

6. Normally, the EXTEC Series 5000 soil screener relies on a hydraulic pressure line system – consisting of a hydraulic piston with two hydraulic lines attached – that, when fully connected and functioning properly, operates to keep the tail conveyor open at a 45° angle.

7. At various occasions in 2022 or 2023, the tail conveyor of the Equipment did not work properly.

8. In the timeframe leading up to August 2023, the Defendant stored the Equipment outdoors in a wooded area, where it was neither used nor serviced.

9. In or around August or September 2023, the Equipment was moved to a yard area on the Defendant's premises.

10. When the Equipment was moved, its tail conveyor was closed in the vertical position.

11. In or around September 2023, a co-owner of the Defendant saw that a hydraulic line fitting at one end of the tail conveyor piston was broken and needed to be replaced. The co-owner used a front-end loader to lift the tail conveyor so that it would be in the open (horizontal) position at an approximate 45° angle and installed a new fitting on the hydraulic line.

12. Because the conveyor hydraulic piston had only one side repaired and connected to the hydraulic system, there was no opposing hydraulic force for the system to maintain the tail conveyor in its open position.

13. On September 6, 2023, the Victim was working at the Defendant's premises in East Freetown, Massachusetts. The Defendant was working on the Equipment alongside one of

the Defendant's owners in an effort to replace the Equipment's soil screen.

14. A third individual used a front-end loader to lift the Victim and the co-owner approximately 8-10 feet up onto the tail conveyor of the Equipment, which was in the open (horizontal) position.

15. At this time, there was no energy control procedure in place to prevent the tail conveyor from collapsing, and no blocking or other hardware in place to prevent such collapse. Based in part on the prior incidents of the Equipment not functioning properly, the Defendant was on notice that additional procedures and/or hardware were needed to prevent a malfunction, such as a collapse.

16. The Victim and the co-owner sought to remove four bolts holding a soil screen in place on the Equipment in order to insert another screen. The co-owner used a large adjustable wrench to remove one of the bolts holding the upper soil screen above the tail conveyor in place and handed the adjustable wrench to the Victim to remove the second bolt.

17. As the Victim was removing the second bolt, the Equipment's tail conveyor closed unexpectedly. The co-owner fell from the machine in one direction. The Victim did not fall off the machine and instead held onto the upper frame of the Equipment as the tail conveyor closed into the vertical position, crushing the Victim.

18. In 2022, the Victim earned approximately $28,000 in wages from the Defendant. In 2023, prior to his death, the Victim earned approximately $28,000 in wages from the Defendant.

19. Prior to the Victim's death, he regularly remitted money derived from his work for the Defendant to the Victim's relatives in Guatemala.

20. In September 2023, the Defendant's insurance carrier denied the Victim's claim for workers compensation benefits. The insurance carrier accepted the claim relating to the Victim's funeral expenses. The Massachusetts DIA initially denied the family's claims for Dependent Benefits. The Victim's Family appealed that decision.

21. In November 2025, while the appeal was pending, the Defendant's insurance carrier and the Defendant reached a Lump Sum settlement to resolve all of the employee's potential DIA claims for a total payment of One Hundred Twenty Thousand ($120,000) Dollars. Of that payment, the insurance carrier will be contributing Seventy Thousand ($70,000) Dollars and the Defendant is required to contribute Fifty Thousand ($50,000) Dollars. These amounts will be paid once the Administrative Law Judge at the DIA receives the and approves the Lump Sum Agreement to be filed by counsel for the Victim's Family.

22. In November 2025, Defendant settled a related Department of Labor claim by promising to enact and follow an abatement plan which is set forth in the OSHA / DOL Settlement which is attached hereto as Exhibit A. .